## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION


| | | |
|---|---|---|
| ANTHONY D. FORSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | CASE NO.  3:11-0109 |
| | ) | JUDGE CAMPBELL/KNOWLES |
| | ) | |
| | ) | |
| DERRICK SCHOFIELD, TDOC | ) | |
| COMMISSIONER, et al., | ) | |
| | ) | |
| Defendants. | ) | |


### REPORT AND RECOMMENDATION

This matter is before the Court upon the pro se Plaintiff's "Emergency Application for

Preliminary Injunction and Temporary Restraining Order."  Docket No. 4.  Plaintiff has

additionally filed a supporting Memorandum of Law (Docket No. 5), and his 24 page,

handwritten Affidavit (Docket No. 6).

Defendants Schofield and Colson have filed a Response with Exhibits, including

Plaintiff's prison medical records.  Docket Nos. 62, 62-1.  Defendant Desiree Andrews has filed

a Memorandum in Opposition, which the undersigned will construe as a Response.  Docket Nos.

64.  Defendant Andrews has also filed her Affidavit.  Docket No. 64-1.

Plaintiff has filed a Reply.[1]  Docket No. 79.

---

[1]  Plaintiff's Reply is essentially argumentative, not factual, and contains a number of
incorrect legal conclusions.  The Reply also requests an immediate evidentiary hearing no less
than 10 times.

Plaintiff, an inmate at the Riverbend Maximum Security Institution, filed this pro se

action pursuant to 42 U.S.C. § 1983, alleging violations of his First and Eighth Amendment

rights. Docket No. 1. Plaintiff filed the instant Motion and accompanying material

approximately three weeks after filing his Complaint.

Rule 65(b)(1), which governs temporary restraining orders, requires "specific facts in an

affidavit or verified complaint . . . ." Neither Plaintiff's Application nor his memorandum of law

is verified, so the Court will focus on Plaintiff's Affidavit.

Plaintiff's Affidavit seeks an injunction:

> to enjoin the defendants and any person that acts in concert with
> them from engaging within the past, current, or future conduct
> which violate the laws enacted by Tennessee and the United
> States.

Docket No. 6, p. 2.

Plaintiff states that he is on the security status of "AS" (presumably Administrative

Segregation), which requires 24 hour confinement to a prison cell, unless release is permitted for

one hour recreation per day "and five (5) days each week." *Id.,* p. 3. He states that he has been

confined to AS for about 9 years. *Id.* He states that his confinement to AS was for a disciplinary

conviction on the charge of assault against a corrections officer, which occurred at Northwest

Correctional Complex (NWCC). *Id.*

Plaintiff states that he is now incarcerated at Riverbend Maximum Security Institution

(RMSI). *Id.* He states that he has been confined on AS at five prisons in the State of Tennessee.

*Id*., p. 4. He states that he has submitted numerous emergency grievances while confined to AS.

*Id.* He states in part:

> after the commencement of the civil action against the defendants

2

> have designated supervisors, or prison administrators, taken
> immediate action or investigated any claims which threatens the
> life of the affiant, and abridgement of any of his privileges or
> rights secured under the laws enacted by Tennessee or either the
> United States.

Docket No. 6, p. 4.

He estimates that he has submitted a total of approximately 200 grievances. *Id.*

Plaintiff states that Defendant Schofield "has taken an oath," and that he is responsible

for "the supervision, discipline, and the control of his subordinates throughout the entire State of

Tennessee." *Id.*, p. 5. He states that the Tennessee Department of Correction (TDOC):

> has adopted the custom or practice which demands that every
> inmate, indiscriminately, will be treated with courtesy, respect, and
> kindness during their prison confinement and regardless of their
> security classification or housing status.

*Id.*

He states that TDOC correctional and medical employees have taken an oath, "which

requires their duties to be executed diligently, professionally, and competently, and in a non-

arbitrary manner when interacting with inmates." *Id.* He states that correctional and prison

employees of TDOC have violated their "administered oath," which constitutes perjury. *Id.,* p.

6.

He states that he and other segregated inmates across the state have filed a series of

complaints, reports, and grievances "concerning designated correctional officers, with stealth

and precision, issuing food trays which were deliberately and intentionally tampered with or

contaminated with an unidentifiable substance as a form of punishment." *Id.*

He further states that prison administrators or supervisors have issued directives for their

subordinates to "abandon the oath as it relates to protecting the affiant." *Id.* He states that a

3

correctional officer could not issue a specially made contaminated altered or poisoned food tray if the officer was truly upholding his or her oath. *Id.*, p. 7. Plaintiff states that no hardship would be placed on any prison employee through enforcing their oath and protecting the affiant with regard to food trays. *Id.*

He states that at RMSI and throughout the entire state, correctional officers boast and brag about contaminating or deliberately altering a food tray. *Id.,* p. 8. He further avers that he "has not eaten hundreds of food trays due to fear and/or from continuously being poisoned by numerous correctional officers who are confined to AS." *Id.* He states that special food trays have been used by prison administrators so that correctional officers can issue contaminated food trays in sequence more easily, "and with stealth and precision." *Id.*, p. 8-9. He states that he is given "such trays." *Id.*

He complains about the incompetent and unprofessional behaviors of the subordinates of Defendant Warden Ricky Bell, who allegedly swing shut a large steel cage to simulate the sound of a bomb or explosive device being detonated approximately 200 times per day. *Id.,* p. 9. He states that Ricky Bell and his subordinates should know that such action is "torturous and cruel." *Id.*

He states that corrections officers use "extreme force" shoving the steel cage open so it can be slammed. *Id.*, p. 10. He complains that there is also an electronic locking device on the steel cage which simulates the discharge of a firearm. *Id.*, p. 11. He complains that corrections officers violate their oath and disrespectfully slam the "security pie flap" continuously throughout the day. *Id.* He states:

> Additional punishment and sleep sensory deprivation is being
> authorized by Warden Bell and Commissioner Schofield through

many other unconstitutional practices condoned and being utilized
by their subordinates other than those which have been set out
herein above.

Docket No. 6, p. 11-12.

He complains that correctional officers repeatedly "smack" metal food trays against trash

cans to simulate an explosive device being detonated or a firearm being discharged. *Id*., p. 12.

He complains that different punishments have been adopted at different institutions

which are "unconstitutional, torturous, cruel, inhuman and barbaric. . . ." *Id.* He states that

complaints about these acts are being ignored. *Id.,* p. 12-13.

He refers to records, logs, investigative reports, and compiled data that "will clearly show

that segregated inmates, including the affiant, are being injured or killed by correctional staff all

across the State of Tennessee . . . ." *Id*., p. 13. He complains that his reasonable requests for

"evidence" that he could present to this Court have been denied. *Id*., p. 14.

He states that correctional employees are ignoring, destroying and discarding inmate

grievances. *Id.,* p. 14.

He further states:

> As a direct consequence for utilizing the grievance process
> administratively, to punish the affiant for seeking redress of
> grievances, and for engaging in his legal activities as a potential
> witness on behalf of numerous segregated inmates while confined
> to AS, the affiant was or is continuously being housed inside on a
> behavioral management cell which is specifically designed to
> house only those inmates to whom [*sic*] have committed violent
> acts while confined to TDOC. The affiant has not committed any
> act of violence which justifies his placement to the special prison
> cell and that did occur on or about December 21, 2010.

*Id*., p. 15.

He states that, while he has been assigned to the behavioral management cell, a series of

5

sanctions has been imposed upon him, including "the denial of an approved visit with his daughter . . ., the denial of equal treatment to other simply-situated non-violent inmates, denial of religious activities, and timely issuance of approved Xmas package, and the denied usage of the portable telephone a weekly basis. . . ." *Id*., p. 15-16.

He states that he was placed in the behavioral management cell for complaining about correctional employees slamming shut the security pie flap that is connected to his prison cell. *Id*., p. 16. He states that prison administrators have ignored grievances which allege that their subordinates have adopted the custom or practice of violating institutional policies, rules, and regulations which govern an inmate's access to the courts while confined to the segregation units. *Id.*, p. 17.

He states that it is the custom or practice of TDOC to permit inmates confined to segregation the opportunity to obtain legal books or research materials from the institutional law library at a minimum of three times per week.[2] *Id.*, p. 17-18. He states that various evidence will show that subordinates will not "timely process any legal requests generated." *Id.,* p. 18. He states that he "has been patiently waiting for the delivery of his legal material several months to no avail," and that "designated prison staff will not honor his requests." *Id*. He states that he cannot "timely conduct preliminary research, prepare, draft or file viable claims and defenses, etc., before the courts . . . ."

He refers to the fact that Defendant, Jane Doe, or the current TDOC Medical Director, has taken an oath to enforce the laws enacted by the State of Tennessee, as has Defendant Desiree Andrews, or the current RMSI Health Administrator. *Id.,* p. 19. He states:

---

[2] Exactly how this situation violates any of Plaintiff's rights is unclear.

6

> Together, the defendants: Schofield, Bell, Jane Doe, and Andrews,
> or designated prison administrators, are obligated to interact with
> each other so procedures can be enacted to guarantee that no
> inmate, including the affiant, is not denied [*sic*] timely, adequate,
> sufficient, follow-up, or preventive medical care for serious health
> ailments while confined to TDOC and or RMSI.

*Id.*, p. 19-20.

He states that these Defendants have ignored a history of complaints and inmate

grievances "which indicate that their subordinates will not provide adequate medical treatment to

segregated inmates, including the affiant, for their serious healthcare needs which inevitably

causes suffering." *Id*., p. 20.

He claims evidence will show that "at no time has medically qualified personnel ever

attempted to assess the medical or physical well being of the affiant, or any segregated

inmate . . . ." *Id*., p. 21.

He complains that his hypertension medication "will not be timely issued to him as

ordered by the physician." *Id.,* p. 21.  He states that he:

> has been unable to participate in his daily routines and institutional
> programs at RMSI due to being denied medical treatment for
> frequent migraine headaches from the continuous slamming of
> metal food trays on to the concrete and trash can; vomitting,
> nausea, and pain in his stomach and right side after consuming
> food trays that correctional officers issue randomly which have
> been contaminated with poison or other harmful and unidentified
> substances; lack of sufficient sleep; irritability; and a constant fear
> of harm or danger from correctional officers and employees to
> whom [*sic*] have not been properly trained to protect the mental or
> physical well-beings of segregated inmates.

*Id.,* p. 21-22.

He complains that, as a result of "being confined continuously in isolation for about nine

(9) calendar years," he "has developed rashes upon his face, head and body, sores in his nose,

7

which won't heal, he has developed severe dandruff, dry skin, which peels, cracks, itches, bleeds, and is very painful." *Id*. He also states that he has become "anemic." He states that he has been stripped of his strength, energy, and health, because he is not able to consume his dietary meals because of fear of food contamination. *Id*., p. 22-23. He states that he:

> is suffering a continuous acute pain in his chest; a continuous pain behind his right eye; blurred vision, and uncontrolled muscle spasms throughout his entire body; occasional and severe muscle cramps; acute pain which is continuous in his lower legs; continuous pain on his right side around his rib cage; and a continuous burning sensation and agonizing pain in his joints, bones, and upper right thigh. *Id*., p. 23.

He complains that these medical concerns and "ailments" are known or should have been known to Defendants, but that "said prison administrators have absolutely taken no steps to ensure that timely, adequate, sufficient, follow-up, or preventive medical care is being afforded to him since his placement to AS." *Id*.

In the instant Motion, Plaintiff seeks a preliminary injunction and TRO that would order Defendants to:

1. Cease and desist from engaging in all continuing forms of retaliation, intimidation, harassments, threats, assaults, acts of torture, cruelty, abuse, or mistreatment to Plaintiff;

2. Cease and desist from engaging in all continuing customs or practices which fail to protect Plaintiff from imminent harm or danger;

3. Cease and desist from engaging in the continuing custom or practice in permitting correctional officers, kitchen stewards, or any individual to be able to exactly identify the food tray that Plaintiff will receive during meal times;

4. Cease and desist from engaging in the continuing custom or practice of subjecting any

8

of Plaintiff's witnesses, inmates or correctional staff to retaliation, intimidation, harassment, threats, assaults, acts of torture, abuse, cruelty or mistreatment;

5. Cease and desist from engaging in the continuing custom or practice which permits correctional staff to blatantly disregard Plaintiff's access to the courts and also permits the untimely processing of legal or administrative requests;

6. Cease and desist from engaging in the continuing or practice in denying Plaintiff adequate medical care from a medical specialist to treat him for his serious health ailments.

The moving party has the burden of proving that the circumstances "clearly demand" a TRO or a preliminary injunction. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The Sixth Circuit applies a four-factor test for determining the propriety of issuing a preliminary injunction or TRO: (1) whether the movant has shown a strong or substantial likelihood of probability of success on the merits; (2) whether the movant has shown irreparable injury; (3) whether the issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing a preliminary injunction. *Mason County Med. Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir. 1977). The failure to show irreparable harm, by itself, can justify the denial of preliminary injunctive relief without consideration of the other three factors. *See Hacker v. FBOP*, 2006 WL 2559792, *8 (E.D. Mich. Sept.1, 2006) (Lawson, J.) ("The failure to demonstrate irreparable harm is fatal to the petitioner's request for a [PI]. Therefore, the Court need not evaluate the other factors.").

Defendants Derrick Schofield and Roland Colson[3] have filed a Response in Opposition to the Motion. These Defendants argue that, in order to obtain injunctive relief, Plaintiff must show

---

[3] Roland Colson has replaced Ricky Bell as the Warden at RMSI.

that he "'has sustained or is immediately in danger of sustaining some direct injury' as the result

of the challenged official conduct and the injury or threat of injury must be both 'real and

immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102

(1983).  Additionally, "[p]ast exposure to illegal conduct does not in itself show a present case or

controversy regarding injunctive relief . . . if unaccompanied by any continuing present adverse

effects."  *Id., citing O'Shea v. Littleton,* 414 U.S. 488, 496 (1974).  Additionally:

> It is the *reality* of the threat of repeated injury that is relevant to the
> standing inquiry, not the Plaintiff's subjective apprehensions.  The
> emotional consequences of a prior act simply are not a sufficient
> basis for an injunction absent a real and immediate threat of future
> injury by the defendant.

*Lyons, supra*, at 108 n.8 (italics in original).

Defendants Schofield and Colson further argue that Plaintiff has failed to show any real

threat of immediate injury, as required by *Williams v. Ellington*, 936 F.2d 881, 889 (6th Cir.

1991).  These Defendants have filed a certified copy of Plaintiff's prison medical records, from

2010 through April 2011, which show his ongoing medical care.  According to the medical

records, Plaintiff has never complained about food poisoning, although he did once complain of

a stomach ache after eating a meal.  On that occasion, however, he refused the offered treatment

of Mylanta.  Additionally, he claimed to have been experiencing muscle cramps for a month in

September 2010, but he refused abdominal x-rays.

These Defendants further state that the noises Plaintiff complains about are a condition of

prison life, and that the medical records do not document any adverse effect from those noises.

These Defendants conclude that Plaintiff has failed to show a strong likelihood of success

10

on the merits, he has failed to show irreparable harm, and he has failed to show "any real threat of immediate injury."

Defendant Andrews has filed a separate Response and an Affidavit, arguing that Plaintiff cannot show any of the four requirements for injunctive relief. Her Affidavit states that she is the Health Service Administrator at RMSI, employed by correctional medical services. Docket No. 64-1, p. 1. She is not a medical professional, and has no control over the medical decisions of the medical professions. *Id.* She states in part:

> 4. Correctional medical services does not have a policy, custom, or procedure of denying reasonably necessary medical treatment to save money. Nor does CMS have a policy, custom, or procedure denying reasonably necessary medical treatment to inmates for any other reason.
>
> 5. Mr. Forster, like the other inmates, is seen at sick call if he signs up the day before. Each day the nurse goes to the unit for sick call if inmates have signed up.
>
> 6. I have never instructed the medical professionals to deny medical care to Mr. Forster. Nor do I have the authority to issue such instructions to the medical professionals.

*Id.,* p. 2.

Defendant Andrews further points out approximately ten specific instances from Plaintiff's medical records showing that he refused treatment for various reasons. Docket No. 64, p. 6 n.34.

As discussed above, in order to obtain injunctive relief, Plaintiff's injury must be irreparable, that is, the legal remedies for the injury must be inadequate. *See Sampson v.*

11

*Murray*, 415 U.S. 61, 88 (1974).  Irreparable injury is defined as "[a]n injury that cannot be adequately measured or compensated by money." *Black's Law Dictionary* 789-90 (7th ed.1999). The Supreme Court has stated that:

> [t]he key word in this consideration is *irreparable.*  Mere injuries, however substantial, in terms of money time and energy necessarily expended in the absence of a stay are not enough. <u>The possibility that adequate compensation or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm</u>.

*Sampson,* 415 U.S. at 90 (italics in original, underlining added, internal quotation and citation omitted). The Sixth Circuit has also noted that "a plaintiff's harm is not irreparable if it is fully compensable by money damages." *Basiccomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir. 1992).

The Court agrees that Plaintiff has not shown any irreparable injury, nor has he shown "any real threat of immediate injury."

Additionally, Plaintiff cannot show a strong or substantial likelihood of probable success on the merits.  In order to succeed on the merits, Plaintiff would first have to state a claim. The United States Supreme Court has recently addressed the appropriate standards that must be applied in considering whether a plaintiff has stated a claim.  *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009).  The *Iqbal* Court stated in part as follows:

> Two working principles underlie our decision in *Twombly*.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice . . . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior error, but it does not

12

> unlock the doors of discovery for plaintiff armed with nothing
> more than conclusions.  Second, only a complaint that states a
> plausible claim for relief survives a motion to dismiss . . . .
> Determining whether a complaint states a plausible claim for relief
> will, as the Court of Appeals observed, be a context-specific task
> that requires the reviewing court to draw on its judicial experience
> and common sense. . . . But where the well-pleaded facts do not
> permit the court to infer more than the mere possibility of
> misconduct, the complaint has alleged - but it has not "show[n]" -
> "that the pleader is entitled to relief."

129 S.Ct. at 1949-1950, 173 L. Ed. 2d at 884 (citations omitted).

Plaintiff's Affidavit is long on conclusory allegations and short on facts.  Many of Plaintiffs claims simply state that certain evidence will show certain things, not necessarily that those things actually have happened.  Additionally, many of Plaintiff's claims are stated in broad, sweeping terms, and it is unclear whether they even apply to Plaintiff.

Many of Plaintiff's allegations border on the frivolous (*e.g.,* his general complaints about noise from a slamming steel cage door and/or security pie flaps and his claims about "oaths") and/or delusional (*e.g.,* his complaint that unnamed prison guards and/or officials are intentionally trying to poison him or contaminate his food).

It certainly does not appear that Plaintiff is being denied access to the courts.  He has successfully filed the instant lawsuit and has submitted numerous documents to the Court.

Plaintiff has not shown a substantial probability of success on the merits, and many of his complaints do not even state a claim upon which relief can be granted.

For the foregoing reasons, Plaintiff's "Emergency Application for Preliminary Injunction and Temporary Restraining Order" (Docket No. 4) should be DENIED.

13

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


_____
E. Clifton Knowles
United States Magistrate Judge

14